# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| BETTYE JACKSON, as Independent Administrator of the Estate of Eugene Washington, Deceased | ) ) ) | |
| | ) | |
| Plaintiff, | ) | No. 3:20-cv-50414 |
| | ) | |
| v. | ) | |
| | ) | Judge Iain D. Johnston |
| | ) | |
| SHERIFF OF WINNEBAGO COUNTY, ILLINOIS, in his official capacity, and JEFF VALENTINE, Individually and as Agent, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bettye Jackson, as the administrator of the estate of the decedent Eugene Washington, brings this action under 42 U.S.C. § 1983 against the Sheriff of Winnebago County and Jeff Valentine. In Count I, Plaintiff invokes the Fourteenth Amendment and claims that Defendants deprived Washington of his civil rights while he was a pretrial detainee in the Winnebago County Jail and claims that this deprivation led to Washington's death. Dkt. 20. Counts IV and V are brought under state law for wrongful death and a Survival Act claim.[1] Defendants now bring this motion for summary judgment. Dkt. 43.

---

[1] Count II was voluntarily dismissed. Dkt. 42. There was no Count III pled.

## I. Background

The following background is taken from the parties' Local Rule 56.1 statements of undisputed material facts. Dkt. 45, Dkt. 49.  In the Winnebago County Jail ("the jail"), between the hours of 10:30PM to 6:00AM inmates are placed on lockdown, and during that period an assigned jail officer monitors the cells remotely from the "Floor Control Desk". Def. SOF, Dkt. 45, at 6. At least one officer is required to be present at the Floor Control Desk at all times. In addition to the remote monitoring, other officers conduct rounds in the cell blocks every thirty minutes. During this period, if inmates are unable to get the attention of officers conducting rounds, the only official way for them to contact officers is to press an emergency intercom button located in each cell that connects them with the officer stationed at the Floor Control Desk. The intercom system is intended for emergency purposes only but is frequently used by inmates for improper non-emergency purposes. When an inmate uses the intercom for an improper purpose, officers are trained to remind the caller that the intercom is for emergency purposes only. The parties agree that most non-emergency calls, such as most plumbing calls[2], do not require an immediate physical response by an officer.

Between 2016–2019, Eugene Washington was an inmate at the jail on five separate occasions. On October 27, 2019, Washington was once again detained at the jail, this time as a pretrial detainee, where he had been detained for

---

[2] Certain plumbing issues, such as flooding, may qualify as an emergency.

approximately two months. As part of standard procedure, the jail conducted medical intake interviews with Washington upon each of his incarcerations. Def. SOF, Dkt. 45, at 9. Washington never disclosed to medical personnel or jail staff that he had sleep apnea or any disease, diagnosis, condition or issue that affected his ability to breathe. *Id.*

During his final stint at the jail, Washington shared a cell with inmate Lamar Simmons. Early in the morning of October 28, 2019, Simmons awoke to the sound of Washington gasping for air while sleeping. Simmons went over to Washington's bed and tried to wake him by shaking him and calling his name, but Simmons was unsuccessful. Simmons Dep., Dkt. 55-10, at 13–14. Washington continued to lay in his bed with his eyes closed, struggling to breathe.

At 4:37AM, on October 28th, Simmons pressed his cell's emergency intercom button to request assistance for Washington. At 4:38AM, the officer on duty at the Floor Control Desk, Defendant Jeff Valentine, answered the call by asking Simmons what the emergency was. The parties give different versions of Simmons' response. Simmons testified that he told Valentine, "My cellie can't breathe." Simmons Dep., Dkt. 55-10, at 9. This testimony was corroborated by the testimony of another inmate. Dkt. 48, at 12. In contrast, Valentine testified that he had difficulty hearing what Simmons said into the intercom but heard Simmons "say something along the lines that the toilet or the sink [was] not working." Valentine Dep., Dkt. 55-6, at 52. Valentine further testified that he

3

asked Simmons to repeat himself, and again heard Simmons say the same thing he previously heard, "that the toilet and the sink were not working." Valentine Dep., Dkt. 55-6, at 52–53. Valentine states that he responded by telling Simmons that the intercom was for emergency use only and ended the call. Plaintiff disputes that Valentine asked Simmons to repeat himself and that Simmons made any statement regarding the toilet or sink. Instead, according to Plaintiff, Simmons replied to Valentine by asking rhetorically "who pushes the button at this time of night and it's not an emergency?" Simmons also testified that the officer he connected with on the intercom "acted like he could not hear [him]" and disconnected the call without saying anything else. Simmons Dep., Dkt. 55-10, at 9. Officers frequently had trouble hearing or understanding what an inmate said over the intercom due to the inmate either speaking too loudly or standing too close to the microphone of the intercom. Arbisi Dep., Dkt. 55-1, at 22, Valentine Dep., Dkt. 55-6, at 52. The parties agree that Simmons was calm and not panicking during the initial call. To Valentine, Simmons' tone did not sound like he was attempting to report an emergency. Plaintiff admits that Simmons had no way of knowing what Valentine heard Simmons say during the first call, and that Simmons "can't speak for his end." Simmons Dep., Dkt. 55-10, at 38–39.

At 4:46AM—eight minutes later—Simmons pressed the emergency call button again. Upon connecting the call, approximately 90 seconds later, Valentine heard Simmons report that Washington was having irregular

breathing. Valentine was able to clearly hear Simmons during the second call and immediately directed officers to respond to Washington and Simmons' cell. After "[a] minute to two minutes, maybe even shorter," the responding officers arrived at the cell. Arbisi Dep., Dkt. 55-1, at 67–68. Simmons testified that he knew his intercom worked "[b]ecause he heard me the second time clearly and hurried up and had them come in, but they [were] not fast enough." Simmons Dep., Dkt. 55-10, at 39. Before the morning of October 28th, Valentine did not know Washington and knew nothing about his medical history.

When officers arrived at the cell, Simmons told them that Washington was not breathing. The officers found Washington on the top bunk, unresponsive, and with his mouth and eyes open. He did not have a detectable pulse, his lips were blue, he was cold to the touch, and he was not breathing. Arbisi Dep., Dkt. 55-1, at 34. Additional officers and medical staff arrived at the cell, performed CPR and used an Automatic External Defibrillator attempting to resuscitate Washington, but to no avail. EMTs arrived and were also unable to resuscitate Washington. They took him to a local hospital, where he was pronounced dead shortly after his arrival.

Dr. Mark Peters performed an autopsy on Washington and opined in the autopsy report that the manner of death was cardiac arrythmia caused by sleep apnea. According to Dr. Peters, arrythmia caused by sleep apnea can result in death either "very fast or very slowly," and a person can be in an arrhythmic state for many minutes before "you finally reach that fatal arrhythmic state."

5

Peters Dep., Dkt. 55-11, at 38. However, Dr. Peters relied on an Illinois State Police summary of Simmons' statements because he was unable to determine Washington's cause of death from his own examination. The parties agree that Dr. Peters did not provide any opinion on the timeliness or adequacy of the resuscitation efforts made by jail staff or EMTs. Def. SOF, Dkt. 45, at 17–18. Nowhere in Dr. Peters' testimony or autopsy report did Dr. Peters provide any opinion on whether any delay in treatment caused Washington pain or contributed to his death. It is undisputed that when Simmons first noticed Washington "gasping for air," his arms were "locked straight in the air" and his eyes were closed. Ditto Dep., Dkt. 55-7, at 44. Despite Simmons attempts to wake Washington, Simmons never saw Washington open his eyes again.

## II. Motion for Summary Judgment

### Legal Standard

A successful motion for summary judgment demonstrates that there is no genuine dispute of material fact and judgment is proper as a matter of law. A party opposing summary judgment must proffer specific evidence to show a genuine dispute of fact for trial. FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the non-movant when viewing the record and all reasonable inferences drawn from it in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the existence of just *any* disputed facts will not defeat an otherwise proper motion for summary judgment. *Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir.

2001). Rather, the disputed facts must be both "genuine" and "material." *Id.* A fact is material if it might affect the outcome of the suit under governing law. *Id.* If the nonmoving party has the burden to establish the existence of an element essential to his case and fails to do so, summary judgment must be granted for the moving party. *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

A party opposing summary judgment "is entitled to the benefit of all favorable inferences that can reasonably be drawn from the underlying facts, but not every conceivable inference." *De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987). The court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). The court does not "judge the credibility of witnesses, evaluate the weight of the evidence, or determine the truth of the matter." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). Summary judgment is appropriate only when the court determines that "no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

## Analysis

In her amended complaint, Plaintiff pleaded a constitutional claim under 42 U.S.C. § 1983 that Defendants Jeff Valentine and his employer, Sheriff of Winnebago Country, failed to timely provide Eugene Washington adequate medical care in violation of the Due Process Clause of the Fourteenth

7

Amendment. Jackson also pleaded two claims under Illinois law: a wrongful death claim, and a Survival Act claim. Before the Court is Defendants' motion for summary judgment on all of those claims. Defendants claim that Washington's civil rights as a pretrial detainee were not violated and further argue they are entitled to the protections afforded by the Illinois Government and Governmental Employees Tort Immunity Act ("Tort Immunity Act").

Although there are disputed facts over whether the Defendants' conduct was objectively reasonable, Defendants are nevertheless entitled to summary judgment on Plaintiff's Fourteenth Amendment claim because Plaintiff failed to present verifying medical evidence that a delay in receiving medical care was detrimental to Washington. In the absence of any remaining federal claim, the Court declines to exercise supplemental jurisdiction over the state law claims in Counts IV and V, and those claims are dismissed without prejudice.

## I. Fourteenth Amendment – Count I

Defendants move for summary judgment on Plaintiff's § 1983 civil rights claims for two reasons. First, Defendants contend that Valentine's conduct during the intercom calls was objectively reasonable. Second, Defendants argue that Plaintiff has failed to provide any verifying medical evidence that the delay in providing Washington with medical care harmed Washington, caused his death, or was otherwise detrimental. The Court does not address Defendants' first argument; instead, summary judgment is granted based on the second argument.

8

Because Washington was a pretrial detainee at the Winnebago County Jail, Plaintiff's claim that Defendants failed to timely provide adequate medical care arises under the Fourteenth Amendment's Due Process Clause. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *see Fisher v. Lovejoy*, 414 F.3d 659, 661 (7th Cir. 2005). Under the Fourteenth Amendment, a plaintiff's claim of constitutionally inadequate medical care is subject only to the objective unreasonableness inquiry, rather than the Eighth Amendment's deliberate indifference test. *Miranda v. County of Lake*, 900 F.3d at 352. So, a pretrial detainee need not prove that the defendant was subjectively aware that his actions were unreasonable. *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018).

The objective unreasonableness inquiry is a two-part test. First, the plaintiff must show that the defendant acted purposely, knowingly, or recklessly. *Id*. Negligence, or even gross negligence, is not enough to satisfy this requirement. *Id*; *see also Kemp v. Fulton County*, 27 F.4th 491, 495–96. Second, the court decides if the conduct was objectively reasonable considering the relevant facts and circumstances. *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020). Although the result is the same, some Seventh Circuit decisions articulate a four-element analysis that requires the plaintiff to prove each of the following elements: (1) that the plaintiff suffered from an objectively serious medical condition, (2) the defendant committed a voluntary act regarding the plaintiff's serious medical need, (3) that act was done purposely, knowingly, or recklessly

9

with respect to the risk of harm, and (4) that the defendant's conduct was objectively unreasonable under the circumstances. *Gonzalez v. McHenry County*, 40 F.4th 824, 827–28 (7th Cir. 2022). Reasonableness is determined from the perspective of a reasonable officer standing in the defendant's shoes. *See Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with 20/20 vision of hindsight").

If a plaintiff alleges that prison officials delayed, rather than denied, medical treatment, the plaintiff must also present "verifying medical evidence" that the delay, instead of the underlying condition, caused the harm. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (internal citation omitted). So, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental. *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). Expert opinions are a form of verifying medical evidence, but not the only form. Medical records, treatment notes, or physician notes that confirm or corroborate a claim that the delay was detrimental can be sufficient. *Id.* However, evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient to meet the verifying medical evidence requirement if it does not assist the jury to determine if a delay exacerbated the plaintiff's condition or otherwise harmed him. *Id.*

10

Plaintiff's amended complaint and response brief frame the claim as a delay in providing medical care case. Dkt. 47, at 9–11 ("Plaintiff Has Produced Sufficient Evidence that Delay in Treatment Caused Washington Harm"); Dkt. 20, at 5, 6. Plaintiff never argued that the case was a denial of medical care case. Dkt. 47, at 9–11; *Walker*, 940 F.3d at 964 ("In cases such as this one—where the plaintiff alleges the defendant delayed, rather than denied, medical treatment—we have required that the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm."). So, any claim based on a denial of medical care is waived. Indeed, although not using the term, Plaintiff's amended complaint and response brief sound as though Plaintiff is making a claim for "loss of chance"; specifically, that Valentine's failure to act in response to the first intercom call decreased Washington's chance at survival. Dkt. 47, at 10. Whether a loss of chance claim exists under 1983 is questionable. *Grafton v. Bailey*, No. 13-2940, 2018 U.S. Dist. LEXIS 85860, at *34 n.3, (citing *Phillips ex rel Phillips v. Monroe County*, 311 F.3d 369 (5th Cir. 2002)). But because the parties have not developed that theory, the Court will not address it. Instead, the Court will limit itself to the issues as framed by the parties.

Because Plaintiff frames the claim as a delay—not denial—of medical care, Defendants argue that Plaintiff lacks any "verifying medical evidence" that the delay in medical treatment, rather than the underlying condition, caused harm. *Walker*, 940 F.3d at 964; *see also Williams*, 491 F.3d at 714–15 ("[A]

11

plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental."). Again, Plaintiff does not quarrel with the proposition that her claim is a delay—not denial—of medical care claim. Instead, Plaintiff argues that sufficient verifying medical evidence has been presented, requiring a trial on the claim.

Under *Walker*, Plaintiff must have "verifying medical evidence" to show that because Valentine dispatched officers to the cell only after the second call, rather than after the first call eight minutes earlier, Washington was harmed, his injury was exacerbated, or that the delay was detrimental. In *Williams*, 491 F.3d at 715, the Seventh Circuit explained the type of evidence that would qualify as "verifying medical evidence." Without doubt, a proper and admissible expert opinion would constitute "verifying medical evidence." *Id.* Equally without doubt, evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient to survive summary judgment. *Id.* But, in *Williams*, the Seventh Circuit found that medical records in conjunction with testimony can be sufficient to allow a fact-finder to determine that the delay caused additional harm. *Id.*; *see, e.g., Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

In this case, Plaintiff chose not to provide expert testimony to support the delay claim. Instead, in response to the summary judgment motion, Plaintiff attempts to rely on medical records. The only medical evidence that Plaintiff produces is the testimony of Dr. Peters and the autopsy report he created. Dr.

Peters testified that the manner of death was natural cardiac arrhythmia caused by sleep apnea. Peters Dep., Dkt. 55-11, at 33. Specifically, Plaintiff claims that Dr. Peters' testimony that Washington suffered a cardiac arrythmia "from at least the time period from when his cellmate noticed him having irregular breathing and was unable to rouse him until the time that he died", is sufficient verifying medical evidence that the delay caused Washington harm. Peters Dep., Dkt. 55-11, at 49–50; Pl.'s Mem. Opp. Sum. Judg., Dkt. 47, at 10–11. But this testimony is merely a post-mortem diagnosis of the manner and cause of death, which standing alone is insufficient to assist the jury in determining whether the delay exacerbated Washington's condition and therefore does not meet the "verifying medical evidence" requirement. *Walker*, 940 F.3d at 964. This type of evidence is evidence of the underlying condition Washington suffered, which is insufficient. *Id.* (the evidence must show that the delay, and not the underlying condition, caused some harm). The proffered evidence is not verifying medical evidence tying harm to the delay. Dr. Peters does not state any opinion on if the delay was detrimental to Washington, nor does he express a view on the timeliness or adequacy of the care that Washington eventually received. Def. SOF., Dkt. 45, at 17–18.

Accordingly, the record does not confirm or corroborate Plaintiff's claim that the delay in medical treatment was detrimental to Washington. *See Williams*, 491 F.3d at 715. On the contrary, there is evidence that Washington was unconscious and unresponsive from the time when Simmons first tried to wake

him to when the officers arrived after the second intercom call. Simmons testified that he never saw Washington open his eyes, and when the responding officers arrived, Washington had no pulse and was cold to the touch. Arbisi Dep., Dkt. 55-1, at 34.

Because Plaintiff failed to present verifying medical evidence, which is an essential element to a claim alleging a constitutional violation due to a delay in medical care, granting summary judgment is proper. Accordingly, the court grants Defendant's summary judgment motion on Count I.

## II. Illinois State Law – Counts IV and V

Plaintiff also asserts claims under state law for wrongful death and under the Survivor Act. When all federal claims have been dismissed before trial, federal courts generally relinquish jurisdiction over the remaining state law claims under 28 U.S.C. § 1367. *Wilson v. Price*, 624 F.3d 389, 395 (7th Cir. 2010). Because no federal questions remain the court declines to exercise 28 U.S.C. § 1367 jurisdiction over the Illinois state law claims.  As a result, the Court need not address the Defendants' arguments under the Tort Immunity Act.

## Conclusion

For the reasons given, Defendants' motion for summary judgement is granted on Count I. Counts IV and V are dismissed without prejudice to being refiled in state court.

Date: October 13, 2022          By:  _____

                                      IAIN D. JOHNSTON

                                      United States District Judge